Robert BELLUOMINI, Appellant,

v.

FRED MEYER OF ALASKA,
INC., Appellee.

No. S–8338.

Supreme Court of Alaska.

Dec. 17, 1999.

Arthur S. Robinson, Robinson, Beiswenger & Ehrhardt, Soldotna, for Appellant.

Kathleen Schaechterle and Kenton K. Pettit, Bogle & Gates, P.L.L.C., Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

Robert Belluomini asserts that Fred Meyer breached the covenant of good faith and fair dealing when it terminated his employment after receiving multiple complaints about harassment, including sexual harassment, from his coworkers. He also argues that in barring him from the store Fred Meyer violated his constitutional rights, for which he deserves damages, including punitive damages. And Belluomini cites reversible error in the trial court's handling of the case and disputes the award of attorney's fees and costs. We find no merit in these

claims, and thus we affirm the trial court's judgment.

## II. FACTS AND PROCEEDINGS

### A. Factual History

When the management of Fred Meyer in Soldotna hired Robert Belluomini in March 1994, it was unaware of the circumstances under which he had left his job in the fall of 1993 at a Fred Meyer store in Anchorage, after one month of employment. During Belluomini's short tenure at the Anchorage store, his direct supervisor, Rob Martin, informed him that a co-worker had lodged a complaint against him for sexual harassment. Although the store director had ordered Martin to fire Belluomini, Martin, who was also Belluomini's roommate, allowed him to resign instead and destroyed the records of the sexual harassment complaint. Because of the way Belluomini and Martin handled Belluomini's discharge, Belluomini preserved his prospects of being rehired by Fred Meyer in the near future. Specifically, he hoped to work at the store opening in Soldotna a few months later.

Belluomini did begin working at the Soldotna Fred Meyer, but soon afterward an employee visiting from the Anchorage store recognized him and informed the store director, Richard Bucy, of Belluomini's history. Bucy and Sam Martin, a regional vice president of Fred Meyer, met with Belluomini and other management personnel. Sam Martin informed Belluomini that he could continue working for Fred Meyer, but only as long as he remained a model employee. Martin indicated that if there were any further complaints of harassment or disruption lodged against Belluomini, the company would terminate him immediately. Belluomini chose to continue working under those conditions.

In May 1995 Martin learned that another employee had lodged a complaint of sexual harassment against Belluomini. In response, Martin told Bucy to investigate the matter. Bucy soon told Martin that Belluomini had threatened several employees who had complained about him. These complaints encompassed "harassment, foul language, [and] threatening conduct" by Belluomini. In the course of Bucy's investigation, two of the three female employees who had complained about Belluomini submitted written statements. In one of these written statements an employee complained that Belluomini had made lewd gestures toward her. In the second written statement another employee reported that Belluomini had propositioned, harassed, intimidated, and threatened her. Additionally, two male employees reported Belluomini had threatened to harm them and their property. Belluomini admitted to making statements to one of these men that might have been construed as threatening. But he claimed that the two had reconciled.

After discussing this information, Martin and Bucy agreed to terminate Belluomini immediately. Following a conference with human resources supervisor Christine DeWitt, Martin decided that it was reasonable not to tell Belluomini about the reports of threats and harassment or the identities of the complainants.

On May 10, 1995, Bucy called Belluomini into a meeting with Vernon Brown, the store's loss prevention manager, and Ginger Schneider, Belluomini's direct supervisor. Bucy informed Belluomini that Fred Meyer had received and investigated more complaints of harassment and threats and had decided to terminate Belluomini.

Belluomini asked who had made the allegations and what he had been accused of doing. In response, Brown read one of the sexual harassment complaints to Belluomini without revealing the complainant's name. According to Brown, Belluomini did not comment on the substance of the accusations but did assert that the original accusation of harassment at the Anchorage store should not be held against him because there was no proof to support it.

Upon being terminated, Belluomini was told that, because he had threatened employees, he would not be allowed on the premises; Fred Meyer presented him with a notice of trespass, which he read but refused to sign.

### B. Procedural History

Belluomini sued Fred Meyer to gain access to his personnel file, and in March 1996 he

won a judgment on that claim. He then filed a complaint against Fred Meyer stating four causes of action: (1) breach of the implied covenant of good faith and fair dealing, (2) termination without good and just cause, (3) tortious interference with his constitutional rights, and (4) a claim for punitive damages based on the tortious interference claim.

The superior court granted Fred Meyer's motion to dismiss Belluomini's third and fourth causes of action; Belluomini abandoned the second. Thus the only cause of action remaining at trial was Belluomini's claim that Fred Meyer had breached the implied covenant of good faith and fair dealing.

At the close of Belluomini's case-in-chief, the superior court directed a verdict in favor of Fred Meyer, finding that "[t]he decision to terminate Mr. Belluomini's employment was based on the complaints of Mr. Belluomini's co-workers, complaints of harassment and intimidation of co-workers, disruption of the workforce, and insubordination." The court also ruled that Fred Meyer's sexual harassment policy "seems to require an opportunity to be heard for the accused harasser," but that the policy was "ambiguous in that regard." The court nevertheless ruled that "Mr. Belluomini was provided with an opportunity to be heard." The court further ruled that Fred Meyer had terminated Belluomini

> for harassment of co-workers or otherwise disrupting the workforce, [behavior for] which Mr. Belluomini was not entitled to an opportunity to respond, nor to progressive discipline. Fred Meyer did not promise Mr. Belluomini otherwise, nor could he have reasonably expected otherwise under the terms of his at-will employment.

Finding no evidence of bad faith or objective unfairness in Belluomini's termination, nor any evidence that Fred Meyer terminated him to deny him the benefits of his employment contract, the court concluded that reasonable jurors could not differ in their

judgment that there was no breach of the implied covenant. The court therefore granted judgment on behalf of Fred Meyer, awarding the company $52,233.85 in attorney's fees and $10,798.21 in costs.

Belluomini appeals this directed verdict, the dismissal of his constitutional tort claim, the denial of his motion to amend his complaint, and rulings forbidding him from calling certain witnesses. He also appeals the court's award of attorney's fees and costs.

### III. *DISCUSSION*

#### A. *Did Fred Meyer Breach the Implied Covenant of Good Faith and Fair Dealing in Its Termination of Belluomini?*

Belluomini argues that although he was an at-will employee, Fred Meyer's personnel manual and sexual harassment policy, as reinforced by his March 1994 meeting with Fred Meyer managers, gave him "pre-termination rights"—"both express and implied"—ensuring that his managers would conduct a thorough investigation of any future accusations of sexual harassment before disciplining him. By failing to conduct such an investigation, Belluomini claims, they breached the implied covenant of good faith and fair dealing. Belluomini insists that he presented sufficient evidence in support of these allegations to survive a directed verdict motion.

■ In reviewing a directed verdict, we consider the evidence in the light most favorable to the non-moving party and will affirm the verdict only if fair-minded jurors could not reach different conclusions.[1]

■ All at-will contracts carry an implied covenant of good faith and fair dealing.[2] As we have stated, "[t]his covenant does not lend itself to precise definition,"[3] but essentially requires that employers "treat like employees alike"[4] and "act in a manner which a

---

1. *See Fairbanks N. Star Borough v. Lakeview Enters., Inc.,* 897 P.2d 47, 53 n. 5 (Alaska 1995).

2. *See Ramsey v. City of Sand Point,* 936 P.2d 126, 133 (Alaska 1997).

3. *Jones v. Central Peninsula Gen. Hosp.,* 779 P.2d 783, 789 (Alaska 1989) (quoted in *Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1223 (Alaska 1992)).

4. *Jones,* 779 P.2d at 789 n. 6.

reasonable person would regard as fair."[5] The implied covenant contains both a subjective and an objective component: the subjective, "good faith" component prohibits an employer from terminating an employee for the purpose of depriving the employee of the contract's benefits; the objective, "fair dealing" component prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair.[6]

Belluomini focuses on the fair-dealing component of the implied covenant. He asserts that even if Fred Meyer had a good faith reason for terminating his employment, the company nevertheless breached the covenant by failing to follow its own termination procedures, which establish an independent obligation of fair dealing.[7]

At trial Belluomini drew this procedural rights argument from Fred Meyer's sexual harassment policy, which outlined a three-step process of investigating complaints of sexual harassment. Step 1 provides that the supervisor or human resources department will interview the accuser; Step 2 directs the supervisor or the department to interview witnesses; Step 3 calls for an interview of the accused employee, stating in relevant part:

> The accused employee has certain rights—do not assume (s)he is guilty before the investigation is complete. No employee should be disciplined for sexual harassment without being given an opportunity to present his/her side of the story.

Belluomini attempted to show at trial that Fred Meyer violated Step 3 by firing him before hearing his side of the story and by denying him information regarding the complaints. On this evidence, Belluomini contends, a jury could have found a breach of the implied covenant. In response to the other reasons Fred Meyer gave for his termination—non-sexual harassment, intimidation, threats against employees, and insubordination (all behavior to which the sexual harassment policy did not apply and for which termination therefore could be imme-diate)—Belluomini now argues that Fred Meyer invented these reasons after the fact solely to justify depriving Belluomini of his rights under its sexual harassment policy.

Fred Meyer responds that it has maintained all along that it terminated Belluomini both for sexual harassment and for intimidation and threats to employees, both male and female—for which termination is automatic and immediate; it did not have to provide Belluomini with any "pre-termination rights." According to Fred Meyer's employee responsibility form, signed by Belluomini, "Employee Conduct Which Will Result In Immediate Termination Without Prior Warning" includes "[i]nsubordination, such as willfully disobeying the instructions of an authorized person-in-charge, or disrespectful conduct toward a supervisor or person-in-charge" and "[o]ther employment-related misconduct which is determined by the company to be of an equally serious nature." Fred Meyer points out that Belluomini introduced into evidence a memorandum by manager Vernon Brown that describes the variety of misconduct that formed the basis for the decision to terminate Belluomini. Fred Meyer further points out that at trial Belluomini explicitly denied arguing that he had been fired in bad faith; he insisted that the merits of his discharge were irrelevant and offered no refutation of the accusations against him. Thus Fred Meyer contends that undisputed evidence at trial established that Belluomini was fired for a number of reasons besides sexual harassment.

■ We agree with Fred Meyer. The evidence that Belluomini introduced supported his claim that Fred Meyer did not follow all of its policies for termination of an employee for sexual harassment. But Belluomini did not dispute the evidence Fred Meyer introduced to show that it had also terminated him for insubordination, non-sexual harassment, and intimidation—conduct for which Fred Meyer's personnel manual provides no procedures analogous to those that apply under its sexual harassment policy.

---

5. *Luedtke*, 834 P.2d at 1224.

6. *See id.* at 1223–24.

7. *See ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1154–55 (Alaska 1988).

It was uncontested at trial that Belluomini was an at-will employee and that except to the extent specified in the sexual harassment policy, Fred Meyer did not need good cause to fire him. Belluomini asserts no legal or factual theory under which the procedural rights accruing to an employee under the sexual harassment policy might extend to an at-will employee fired for other misconduct. Belluomini has insisted that Fred Meyer's actual reasons for firing him were irrelevant to his implied covenant claim, arguing that this claim only concerned the procedural fairness of his termination, not the underlying substantive justification. He stated in an affidavit to the trial court that "what my accusers say I did to harass them and Fred Meyer's belief that I committed harassment are not particularly germane to the issue in my case for unjust discharge."

Given Belluomini's express disavowal of any claim of bad faith against Fred Meyer, his attempt to resurrect this issue on appeal is unavailing.[8] At trial Belluomini failed to controvert substantial evidence showing that Fred Meyer had numerous valid reasons for discharge apart from sexual harassment and that it acted in good faith in ordering his termination. Under these circumstances, we hold that the superior court properly directed a verdict in favor of Fred Meyer on Belluomini's implied covenant claim.

B. *Did the Trial Court Err in Granting Fred Meyer's Rule 12(b)(6) Motion to Dismiss Belluomini's Constitutional Tort Claims?*

■ We review an order dismissing a complaint for failure to state a claim de novo. " 'If, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient.' ... [We] 'must presume all factual allegations of the complaint to be true and [make] all reasonable inferences ... in favor of the non-moving party.' "[9]

■ Belluomini claims that the superior court committed error in dismissing his constitutional tort claim and his related claim for punitive damages. When Fred Meyer terminated Belluomini, it presented him with a notice forbidding him from entering any Fred Meyer store or premises and threatening to prosecute him for criminal trespass if he did so. Four months later, a Fred Meyer manager spotted Belluomini in the Soldotna store and told him that he was not allowed in the store until the lawsuit was resolved and that he would be arrested if he returned.

In his complaint, Belluomini claimed that this prohibition tortiously interfered with his constitutional rights. His theories in pressing this claim were that Fred Meyer had wrongfully excluded him from the store "because he had exercised his right and privilege granted by the constitution and laws of Alaska to bring suit against Fred Meyer," and also that Fred Meyer had "oppressed and threatened him with the intent to deprive him of a right and privilege granted him by Article 1 of the Alaska Constitution,". namely, his "right of liberty to freely shop at a retail place of business open to the public." Belluomini sought compensatory and punitive damages for Fred Meyer's interference with these rights.

Before trial, the superior court dismissed Belluomini's claim, ruling that Alaska law does not recognize the tort of interference with a constitutional right. Belluomini challenges this ruling. He relies on AS 11.76.110, which declares interference with constitutional rights to be a "class A misdemeanor," and on AS 11.81.210, which provides that the criminal code

does not bar, suspend, or otherwise affect any right to or liability for damages, penalty, forfeiture, or other remedy authorized by law to be recovered or enforced in a civil action, regardless of whether the con-

---

8. See *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) ("As a general rule, a party may not present new issues or advance new theories to secure a reversal of a lower court decision.").

9. *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988) (quoting *Linck v. Barokas & Martin*, 667 P.2d 171, 173 (Alaska 1983) and 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 12.07, at 12–63 (1986) (citation omitted) (alterations in original)).

duct involved in the proceeding constitutes an offense defined in this title.

Belluomini asserts that this latter provision evinces a legislative intent to create a private civil action for crimes such as interference with a constitutional right.

■ But Belluomini argues against a long-standing legal principle: state and federal courts have historically recognized that the constitution protects individuals from state action but not from similar deprivations by private actors.[10] Thus, Alaska's criminal statute prohibiting interference with a constitutional right, AS 11.76.110, does not itself imply a purely private cause of action. Neither does the criminal code's general disclaimer that its provisions do not "affect any right to or liability ... authorized by law"[11] create new remedies or demonstrate a legislative intent to do so. Because we find no legal basis for recognizing interference with a constitutional right as a private cause of action, we conclude that the superior court properly dismissed Belluomini's constitutional tort claim.

C. *Did the Trial Court Err in Denying Belluomini's Motion to Amend His Complaint Pursuant to Alaska Civil Rule 15(b)?*

■ We will reverse the trial court's denial of a litigant's motion to amend its complaint only if we are left with a definite and firm conviction that the lower court erred.[12]

At the close of his case-in-chief, Belluomini moved to amend his complaint to allege that, in dealing with Belluomini after discovering his failure to disclose the prior incident of sexual harassment in Anchorage, Fred Mey-

er converted Belluomini's status from at-will employment to employment for cause. In particular, Belluomini pointed out that Fred Meyer Regional Vice President Sam Martin told him that he could continue to work for Fred Meyer but that Martin would personally conduct a thorough investigation of any future complaints of sexual harassment against him. Belluomini reasoned that in return for his acceptance of Martin's conditions of continued employment, Fred Meyer contracted not to fire him for sexual harassment without first thoroughly investigating and substantiating any future sexual harassment allegations.

The trial court refused to allow this mid-trial amendment. On appeal Belluomini argues that this ruling was in error. He contends that the amendment he proposed would have conformed his complaint to the evidence produced at trial and that Fred Meyer had given the amendment its implicit consent.

■ A court should grant a party leave to amend where justice requires and if the amendment will not result in injustice to the opposing party.[13] Alaska Civil Rule 15(b) allows a party to amend its complaint when an issue not included in the pleadings is "tried by express or implied consent of the parties."

■ But we have previously recognized that a party's failure to object to an opponent's passing mention of a potential new claim does not amount to an implied consent under Rule 15(b), commenting that

[s]uch a position ... would require counsel to comb through all the discovery adduced from an adverse party and make motions

---

**10.** *See* U.S. Const. amend. XIV ("nor shall any state deprive any person of life, liberty, or property, without due process of law ..."); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ("In 1883, this Court in the *Civil Rights Cases* affirmed the essential dichotomy set forth in that Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' against which the Fourteenth Amendment offers no shield.") (citation omitted); *Miner v. Commercial Fisheries Entry Comm'n*, 635 P.2d 827, 829 (Alaska 1981) ("It is a basic tenet of due process that its prerequisites are state action and the depriva-

tion of an individual interest of sufficient importance to warrant constitutional protection."); *cf. Thoma v. Hickel*, 947 P.2d 816, 824 & n. 5 (Alaska 1997) (evincing judicial hesitance to recognize direct constitutional remedies).

**11.** AS 11.81.210.

**12.** *See Siemion v. Rumfelt*, 825 P.2d 896, 898 n. 2 (Alaska 1992).

**13.** *See* Alaska R. Civ. P. 15(a); *Estate of Thompson v. Mercedes–Benz, Inc.*, 514 P.2d 1269, 1271 (Alaska 1973).

to strike answers which are suggestive of unpled theories. This would be unduly burdensome on counsel, and would needlessly increase the trial court's motion practice.[14]

Thus Fred Meyer's failure to object to Belluomini's comments concerning his new contract theory does not imply that the company consented to trial on that issue.

In any event, any error in denying Belluomini's motion to amend the complaint would have amounted to harmless error. The theory advanced in Belluomini's proposed amendment is essentially identical to the one that he advanced in his implied covenant claim. Belluomini relies on the same facts to support both claims, and both claims stumble on the same legal pitfall: Both rely on facts tending to establish, at most, that Fred Meyer needed to make a formal determination of good cause before it could fire Belluomini for sexual harassment; these facts provide no basis for concluding that the company needed to make a comparable good-cause determination before firing Belluomini for other reasons.

We thus find no reversible error in the denial of Belluomini's motion to amend his complaint.

D. *Did the Trial Court Abuse Its Discretion in Denying Belluomini's Attempts to Supplement His Witness List?*

We review the trial court's admission or exclusion of evidence for abuse of discretion.[15] We will reverse such a decision only when left with the definite and firm conviction that the trial court erred in its decision.[16]

Belluomini argues that the trial court erred in precluding him from calling witnesses in the course of the trial. Specifically, he wished to call Fred Meyer employees Christine Carmichael, Kenneth Pearcy, Ginger Schneider, and Richard Steen, after learning that Fred Meyer would not be calling them as witnesses. In his offer of proof, Belluomini asserted that he would elicit testimony from these witnesses to show bad faith on the part of Fred Meyer.

But the trial court could properly reject Belluomini's requests to call these witnesses because he had failed to include them on his witness list and offered no good reason for this omission. Moreover, because Belluomini had expressly disavowed any claim of bad faith against Fred Meyer, the proposed witnesses' testimony concerning Fred Meyer's bad faith would have been wholly irrelevant. Accordingly, we conclude that the trial court did not abuse its discretion in refusing Belluomini's attempts to supplement his witness list.

E. *Did the Trial Court Abuse Its Discretion in Awarding Attorney's Fees and Costs to Fred Meyer?*

"An award of attorney's fees will only be reversed for an abuse of discretion, which exists if the award is arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[17] Questions as to the reasonableness of fees awarded under Civil Rule 82 are committed to the sound discretion of the trial court.[18]

The trial court awarded Fred Meyer $54,233.85 in fees—thirty percent of its total fees, pursuant to Rule 82(b)(2)—and $10,798.21 in costs. In doing so, the trial court made no independent fee calculation but awarded Fred Meyer all of its requested fees. The clerk of court did provide its own calculation of costs. Belluomini contests several components of this total, amounting to $47,747.50.

1. *Fees*

a. *Fees for motions for summary judgment*

Belluomini opposes the award of attorney's fees for Fred Meyer's motions for

**14.** *Superior Fire Protection Co. v. Du Alaska Co.,* 772 P.2d 1088, 1089 (Alaska 1989).

**15.** *See Yang v. Yoo,* 812 P.2d 210, 217 (Alaska 1991).

**16.** *See Bliss v. Bobich,* 971 P.2d 141, 144 n. 3 (Alaska 1998).

**17.** *Hughes v. Foster Wheeler Co.,* 932 P.2d 784, 793 (Alaska 1997).

**18.** *See Integrated Resources Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 304 (Alaska 1990).

summary judgment, totaling $32,186.50, because those motions were unsuccessful. Fred Meyer defends the fee award, asserting that it did not have to prevail to be awarded fees.

We have addressed this question squarely, in *Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Railway Company,* stating,

> This contention is untenable. Rule 82(a) does not require that attorneys' fees be calculated with reference to the disposition of individual issues. Rather, it expressly provides that a reasonable award of fees shall be made, at the trial court's discretion, to the *prevailing party.* The clear meaning of that provision is that the party who prevails on the principal dispositive issue is entitled to reasonable costs calculated according to the trial court's discretion.[19]

We see no reason to depart from that holding here.

b. *Attorney's fees for interviews, expert witnesses*

▮ Belluomini also challenges $1,560 in fees for Fred Meyer's counsel's time spent interviewing and consulting with expert witnesses; he contends that Fred Meyer never called these witnesses at trial and informed Belluomini well before trial that it did not intend to call them. Fred. Meyer responds that it had to consult with these witnesses to prepare to rebut the expert testimony that Belluomini initially stated he would present at trial but then did not. Fred Meyer also claims that it needed expert testimony to rebut testimony as to damages claims that Belluomini presented at trial. The record backs up Fred Meyer's argument that these attorney's fees were incurred for a legitimate

purpose, and Belluomini does not establish that the amount of disputed fees was unreasonable.

c. *Fees for second attorney*

▮ Belluomini opposes compensation for a second attorney representing Fred Meyer, whose fees totaled $12,818, arguing that the case was not so complex that it required more than one attorney to be present at trial. Fred Meyer responds that a second attorney was necessary; it also notes that Belluomini's counsel employed two paralegals and other assistants.

We see no reason, and Belluomini offers none, to overrule the discretion of the trial court here. Belluomini has failed to show that the trial court's findings are manifestly unreasonable or otherwise oppressive.[20] "It is ... for the trial judge to determine whether too much time was spent by attorneys for the prevailing party or whether too many attorneys were employed."[21] Given that Belluomini makes no substantive argument about the fairness of this award, we uphold the judgment of the trial judge, who was able to gauge firsthand in this case whether a second attorney was necessary.

d. *Fees for opposition to petition for review*

Belluomini contests $1,183 of the fee award, alleging that it was based on Fred Meyer's preparation at the appellate, rather than trial court, level. But before the trial court entered its award of fees, Fred Meyer withdrew its request for the fees relating to this appeal. Thus, the issue is moot.[22]

e. *Calculation of fees*

Belluomini objects that the trial court awarded Fred Meyer more than thirty per-

---

19. 658 P.2d 776, 779 (Alaska 1983) (footnote omitted).

20. *See Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 39 (Alaska 1998); *Feichtinger v. Conant,* 893 P.2d 1266, 1268 (Alaska 1995).

21. *Integrated Resources Equity Corp.,* 799 P.2d at 304.

22. We note that in the body of Fred Meyer's memorandum in reply to Belluomini's objection to its fee application Fred Meyer reported $494

in appellate fees. But in the conclusion of the same memorandum it misstates that withdrawn amount as $442, apparently omitting $52 in fees associated with its preparation of its petition for review. The trial court's attorney's fee order overlooked this discrepancy and awarded Fred Meyer fees based on the additional $52. Accordingly, upon return of this case to the superior court, the court should correct this error. *See* Alaska Civil Rule 60(a).

cent of its fees without explaining its departure, in violation of Rule 82(b). But in fact the trial court's calculation does equal thirty percent, save a small discrepancy attributable to a clerical error.[23]

### 2. *Costs*

█ Belluomini disputes the trial court's award of costs, stating that Fred Meyer did not serve on him a cost bill and notice of hearing, as required by former Civil Rule 79(a). He asserts that the court should have construed Fred Meyer's failure as a waiver of its right to recover costs.

But our review of the record shows that the confusion over costs resulted from an amendment to Rule 79 that took effect at the time costs were at issue in this case. Belluomini does not contend that the failure to file a notice prejudiced him in any way, either by denying him a timely hearing or diminishing his opportunity to object to the costs filed. To find a waiver under these circumstances would amount to "senseless formalism" of the kind that we have abjured in other cases involving cost awards.[24] Accordingly, we find no error in the cost award.

### IV. *CONCLUSION*

For the foregoing reasons, we AFFIRM the superior court's judgment.[25]

---

**23.** *See supra* note 22.

**24.** *See Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1038–39 (Alaska 1986) (ruling that to deny a party costs because it filed its cost bill prematurely "would be 'senseless formalism,'" where the early filing "did not deprive the school district of a timely hearing. On the contrary, the school district attended the cost hearing, and stated its objections verbally and in writing"); *Isaacson Structural Steel Co. v. Armco Steel Corp.*, 640 P.2d 812, 815 (Alaska 1982); *see also City and Borough of Juneau v.*

*Commercial Union Ins. Co.*, 598 P.2d 957, 960 (Alaska 1979) (allowing trial court to invoke Civil Rule 94 to relax rules to prevent injustice and permit taxation of costs, where party suffered no prejudice by late filing of notice of cost bill hearing).

**25.** Because we affirm the judgment, we need not address Belluomini's claim that upon retrial he should be allowed to present evidence of future wage losses.