Cindy LENTINE, Appellant,

v.

STATE of Alaska, Appellee.

No. S–14091.

Supreme Court of Alaska.

July 27, 2012.

---

38. *Id.* at 11, 13.

Kenneth W. Legacki, Anchorage, for appellant.

Brenda B. Page, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The State of Alaska dismissed an employee based upon the charge that the employee submitted a falsified timesheet and claimed full pay for a week when she was not working. The employee argues that her dismissal violated the implied covenant of good faith and fair dealing because a biased supervisor was involved with the termination decision, because the State's investigation was conducted unfairly, and because she was treated differently from similarly situated employees. We affirm the superior court's decision that there was insufficient evidence to show a breach of the implied covenant on any of these grounds. We also affirm the superior court's ruling that the employee's unfair labor practice claim was untimely and therefore waived. Finally, we affirm the superior court's award of attorney's fees to the State.

## II. FACTS AND PROCEEDINGS

### A. Facts

Cindy Lentine worked for seven years as an administrative manager at the Alaska Division of Wildlife Conservation, which is part of the Department of Fish and Game. Her position originally involved supervising other administrators and addressing human resources and budgeting matters. In 2001, one of Lentine's supervisees, Sandra Robinson, filed a grievance against her.[1] Robinson believed that Lentine had falsely accused her of "fudging" employee timesheets. The conflict was resolved by splitting Lentine's duties between herself and Robinson: Lentine retained responsibility for budget and accounting, and Robinson gained responsibility for personnel and timekeeping matters. Over

time, Lentine regained responsibility for some matters involving employee timesheets.

Lentine experienced communications problems with another employee, David Thomson, in 2007. Thomson served as the Wildlife Division's administrative manager in Juneau. Lentine sent her supervisor, Grant Hilderbrand, an email complaining about Thomson's behavior. The final email is not in the record, but in a draft, Lentine wrote: "I am asking you to tell David, in your nice way, to back off. We all have a lot of work to do and I do not have the time to tread water around David." Hilderbrand testified that he received an email from Lentine that was "similar" to the draft in the record. It was "fairly clear" to Hilderbrand that Lentine and Thomson "didn't really enjoy each other's company," but Hilderbrand "didn't view it as a major problem." Instead, Hilderbrand saw it as a situation where "folks that don't typically like each other do have to work together [and] get things done."

Lentine's colleague, Robinson, was diagnosed with breast cancer in 2007. That September, Lentine—who is a breast cancer survivor—agreed to accompany Robinson to the Mayo Clinic in Rochester, Minnesota for treatment. Before the trip, Lentine filled out a request for one week of leave and had it signed by Fish and Game's acting supervisor, Earl Becker. (Hilderbrand, the regional supervisor, was on vacation at the time.) The request indicated that Lentine would take a full week—37.5 hours—of personal leave; under "explanation," Lentine wrote "Mayo Clinic."

Lentine and Robinson arrived in Minnesota on Monday, September 24, 2007. Lentine testified that she spent most of the week in the lobby of the Mayo Clinic while Robinson attended appointments. On Wednesday, Lentine's mother, who lived about 150 miles away, came to Rochester to join them. On Friday, Lentine and Robinson drove Lentine's mother home in the afternoon, and they returned to Anchorage that weekend.

The next week, Robinson left a timesheet for the week of September 24 on Lentine's office chair. The timesheet, signed by Hil-

---

1. A pseudonym has been used to protect her privacy.

derbrand, indicated that Lentine had worked the full week. Hilderbrand testified that he was not aware of any inconsistencies with the timesheets because his practice was to sign timesheets without reviewing them first. Having just returned from vacation himself, "it didn't surprise [him] at all" that he did not notice that Lentine and Robinson had been absent the previous week. Although Robinson told Lentine that she had informed Hilderbrand that Lentine had worked a full week in Minnesota, Hilderbrand did not recall such a conversation. Robinson also changed Lentine's record from leave time to work time on the office's computerized time management system. Robinson explained her actions in an email to Lentine: "[Y]ou were working while we were in Rochester so I deleted the leave from your timesheet and entered it as time worked. I hope that is okay with you."

That Friday, Robinson came to Lentine's office and told Lentine she had "done [Lentine] a favor" by arranging for Hilderbrand to sign the new timesheet. According to an investigatory interview, Lentine expressed to a colleague that she was uncomfortable with Robinson's actions, that she had not worked the full week in Minnesota, and that she planned to have Robinson change the timesheet back to leave time. Nonetheless, Lentine did initial the new timesheet. She forgot to add the date, so another employee backdated her signature to October 1 while the timesheet was being processed.

Before and during the Minnesota trip, Lentine exchanged emails with a former colleague, Lauri Ritter, who had since retired. Lentine told Ritter that she would be "checking emails and voice mail" while in Minnesota, and after she returned, she reported that she and Robinson "had some fun by sightseeing, eating and shopping." Ritter apparently became suspicious of Lentine's intentions, and she wrote to Thomson with her concerns: "It kind of sounds like [Lentine and Robinson] are going to pretend that they are still in communication via the email and voice mail as if they aren't even gone." Two days later, Ritter wrote: "[I]t will be interesting to see what their timesheets show." After Lentine submitted her amended timesheet,

Ritter wrote to Thomson: "I CANNOT believe the nerve!" Thomson replied: "This is not the way to do business."

After learning that Lentine submitted a timesheet showing that she had worked a full week in Minnesota, Thomson conveyed his concerns to the Division of Personnel. That division assigned an investigator, Pam Keane, to look into the matter. Keane spoke with Thomson, and Thomson forwarded Ritter's email messages to Keane. According to Keane, Thomson remained involved "[a] little bit" in the investigation, although she did not indicate the exact nature of his involvement.

Keane started her investigation by speaking with Hilderbrand and with Robinson's supervisor. Keane and Hilderbrand discussed Fish and Game's timekeeping practices. Keane then interviewed Lentine. Hilderbrand's memo to Lentine scheduling this interview described Lentine's alleged misconduct as "misrepresent[ing] actual hours worked on your timesheet for pay period ending September 30, 2007." The memo informed Lentine that "these allegations in and of themselves[ ] may result in discipline up to and including dismissal." According to the memo, the interview would be Lentine's "only opportunity ... to rebut these allegations, provide explanation or offer mitigating circumstances."

Keane, Lentine, Hilderbrand, and Steve Porter, Lentine's union representative, attended the interview. Lentine told Keane that she had initialed the amended timesheet because Robinson had pressured her to do so. She expressed strong remorse, explaining that she was "caught up in the emotion and trying to build a relationship with [Robinson]." Lentine stated that she checked emails on the trip and talked to Robinson about work; she told Keane: "I can understand where [Robinson] really sincerely thought that we were working during that time by our discussions. But I feel bad— that was not my intent. I clearly had intended to take leave." Lentine explained Hilderbrand's signature on the amended timesheet by noting that Hilderbrand "just trusts his people and just signs away on [timesheets]."

Keane then interviewed Robinson. Robinson was accused of misrepresenting her own work hours and of falsely entering information on Lentine's timesheet. Responding to the first charge, Robinson maintained that she worked about two hours a day in Minnesota, as she reported on her time sheet. Responding to the second charge, Robinson stated that she did believe Lentine had worked full time, or 7.5 hours per day, in Minnesota. She said that while in the Mayo Clinic lobby, Lentine "would always be on her computer working."

During the course of the investigation, Lentine sent a memorandum to Porter, her union representative. The memo expressed Lentine's desire to file grievances against Hilderbrand for signing her amended timesheet before Lentine herself had signed it, against another employee who had certified the timesheet, and "most of all" against Robinson for "fudging" her timesheet without her approval and then "pressuring [Lentine] into initialing the timesheet ... by convincing [her] that [they] both were 'working' at the Mayo Clinic."

Keane held a second investigative interview with Lentine to clarify the discrepancies between Lentine's and Robinson's accounts. Keane's handwritten notes from that interview indicate that Lentine repeated her account from the first interview: She had checked and responded to work email while in Minnesota and talked with Robinson about work, but she did not "really consider that [to be] working." According to Keane's notes, Lentine reiterated that she had a lapse in judgment and questioned Robinson's integrity on timekeeping matters.

Following the investigation, Keane, in consultation with her supervisors Stacie Bentley and Personnel Division Director Nicki Neal, decided to terminate Lentine for falsely claiming a week of pay for time not worked. Robinson was also terminated for changing Lentine's timesheet.[2] Keane gave her recommendation to Lentine's supervisors, Hilderbrand and Wildlife Division Director Doug Larsen, who "ultimately agreed" to the decision to dismiss Lentine. Keane testified

that Thomson did not participate in the dismissal decision. Larsen testified that he could not remember whether Thomson attended the meeting in which the dismissal decision was made.

Hilderbrand sent Lentine a memo informing her of her termination on December 3, 2007. The memo emphasized that Lentine's position as an administrative manager meant she was "held to a higher standard than other staff on administrative issues" and explained the reason for the dismissal as Lentine's "intentionally sign[ing]" a timesheet that misrepresented her actual hours worked.

The next day, Lentine wrote to Larsen, asking him to speak on her behalf against the termination decision. She described signing the amended timesheet as "totally out of character" and a "lapse of judgment" caused by pressure from Robinson. Lentine suggested that mitigating circumstances—her record of honesty and the financial hardship of potential future breast cancer treatment—warranted probation rather than dismissal. Larsen replied that he was "informed about all of the circumstances surrounding the dismissal" and "involved in the final decision." He recommended she address further concerns to her union representative.

Lentine proceeded to file a Step 2 grievance, represented again by Porter. The grievance asserted that Wildlife Division supervisors routinely allowed employees to file inaccurate timesheets under an unofficial "comp time" policy and that Lentine had been unfairly singled out. According to the grievance, Lentine did not bring up the comp time policy as a defense to investigators because she did not want to implicate her colleagues in any wrongdoing or "alienate their support."

After the grievance was filed, Thomson wrote a memo to Keane supporting Lentine's dismissal. Thomson wrote that "[t]he Division has no un-stated comp time policy." He also argued that regardless of any such policy, Lentine "was fully prepared to take personal leave for the week ... she was pre-

2. Robinson was not disciplined for marking that she had worked two hours a day in Minnesota, because she had advance approval from her supervisor for that arrangement.

pared to not use any 'comp time' she feels she had accrued."

Lentine's grievance was denied, in part because Lentine never obtained permission to use "comp time" to claim her week in Minnesota as time worked. Keane drafted the denial; it was signed by the Commissioner of the Department of Fish and Game.

Lentine then filed a Step 3 grievance, which noted that Hilderbrand himself worked irregular hours but nonetheless recorded a routine 8 to 5 workday on his timesheets. That grievance was also denied. A labor relations analyst drafted the response, and Personnel Division Director Nicki Neal signed it on behalf of the Commissioner of the Department of Administration.

Porter recommended that the union not pursue Lentine's grievance to arbitration. In his memo to the union's grievance committee, Porter noted that even if an unofficial comp time policy existed, Lentine "never approached Grant Hilderbrand with a request for comp time." Lentine appealed the union's decision, and the grievance committee again chose not to pursue arbitration.

### B. Proceedings

Lentine filed a complaint against the State in August 2008. She alleged that the State violated the implied covenant of good faith and fair dealing by dismissing her for actions "for which no one else was disciplined." The trial court denied both parties' motions for summary judgment and held a five-day bench trial in June 2010. Witnesses included Lentine, two of her former supervisors, State investigator Keane, a union official, Wildlife Division Director Larsen, and Personnel Division Director Neal.

In addition to her claim of disparate treatment, Lentine argued at trial that she had worked a full week in Minnesota and was not given the opportunity to prove her work schedule during the investigation. She also argued that the investigation was compro-

mised by the alleged bias of Thomson. During cross-examination of a witness, Lentine's counsel raised the claim for the first time that the State committed an unfair labor practice by not following the Collective Bargaining Agreement's (CBA) procedural requirements during the grievance process.

The superior court ruled in favor of the State in an oral decision issued in September 2010. The superior court found that Lentine worked at most "one to two hours per day" in Minnesota and that had she worked more than that, she would have produced supporting evidence during the investigation. The superior court further found that although Fish and Game allowed for flexible work hours, Lentine did not show disparate treatment because there was "insufficient evidence" to prove that supervisors knowingly permitted other employees to claim work hours for leave time. On the claim of Thomson's bias, the superior court found no "overt act" by Thomson that interfered with Lentine's right to a fair hearing and no evidence of "bad motive" on Thomson's part. Finally, the superior court found that Lentine's unfair labor practice claim was untimely and therefore waived, but nonetheless ruled that a change in the grievance process would not have altered the result because Lentine did not have a viable underlying claim. The trial court awarded $50,586.14 in attorney's fees and costs to the State, representing 30% of the State's actual reasonable fees and costs.

### III. STANDARD OF REVIEW

■■■ "Whether an employer's action breached the covenant of good faith and fair dealing is a question for the trier of fact." [3] We review that factual finding "for clear error, and will reverse only if we have a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." [4] "[I]t is the function of the trial court, not of this court, to judge witnesses'

---

**3.** *Crowley v. State, Dep't of Health & Soc. Servs.,* 253 P.3d 1226, 1229 (Alaska 2011) (citing *Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1223 (Alaska 1992)).

**4.** *Id.* (quoting *Fletcher v. Trademark Constr., Inc.,* 80 P.3d 725, 729 (Alaska 2003)) (internal quotation marks omitted).

credibility and to weigh conflicting evidence."[5]

A superior court's procedural decisions are reviewed under an abuse of discretion standard.[6] We also review awards of attorney's fees for abuse of discretion.[7] "We will reverse a ruling for abuse of discretion only when we are left with a definite and firm conviction, after reviewing the entire record, that the trial court erred."[8]

## IV. DISCUSSION

### A. The State Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing.

The implied covenant of good faith and fair dealing covers all employment contracts in Alaska.[9] It has both a subjective and an objective component.[10] The subjective component prohibits an employer from "acting with a subjectively improper motive";[11] the objective component "prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair."[12] Lentine argues that her

dismissal violated both aspects of the implied covenant of good faith and fair dealing.

### 1. The superior court did not err in finding that Lentine did not prove a subjective breach of the implied covenant.

The subjective component of the implied covenant "prohibits an employer from terminating an employee for the purpose of depriving the employee of the contract's benefits."[13] Lentine contends that her dismissal violated this component through the alleged bad faith of Thomson, who oversaw the Wildlife Division's administrative functions from its Juneau headquarters. Lentine argues that Thomson's actions should be analyzed under the "cat's paw" doctrine, recently discussed by the United States Supreme Court in *Staub v. Proctor Hospital*.[14] That doctrine holds an employer "liable for the animus of a supervisor who was not charged with making the ultimate employment decision."[15] But courts have generally applied the cat's paw doctrine to cases arising under federal anti-discrimination statutes, rather than cases involving solely personal animus.[16] Here, Lentine

---

5. *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (quoting *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999)).

6. *Rockstad v. Erikson*, 113 P.3d 1215, 1219–20 (Alaska 2005).

7. *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 283 (Alaska 2004).

8. *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1119 (Alaska 2002) (citing *Dougan v. Aurora Elec. Inc.*, 50 P.3d 789, 793 (Alaska 2002)).

9. *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 844 (Alaska 2010) (citing *Mitchell v. Teck Cominco Alaska, Inc.*, 193 P.3d 751, 760 (Alaska 2008)).

10. *Id.* (citing *Mitchell*, 193 P.3d at 761).

11. *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002) (citing *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1139 (Alaska 1999)).

12. *Mitchell*, 193 P.3d at 761 (quoting *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1013 (Alaska 1999)) (internal quotation marks omitted).

13. *Id.* (quoting *Belluomini*, 993 P.2d at 1013).

14. —— U.S. ——, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011).

15. *Id.* at 1190.

16. *Id.* (applying cat's paw doctrine to Uniformed Services Employment and Reemployment Rights Act); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir.2007) (holding that cat's paw applies in Age Discrimination in Employment Act cases and other cases involving "a plaintiff's protected activity," including cases arising under Title VII of the Civil Rights Act); *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir.2003) (applying cat's paw to Pregnancy Discrimination Act); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir.2000) ("One method [of proving dismissal was a pretext] is to show that discriminatory comments were made by ... those in a position to influence the decisionmaker" in a Title VII case); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311–12 (D.C.Cir.1998) (applying cat's paw to Title VII case); *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir.1997) (applying cat's paw to Title VII case and citing previous decisions applying the doctrine to age discrimination and cases of "discriminatory motive"); *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir.1994) ("[a]n employer cannot escape responsibility for [ ] discrimination ..., when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [a protected class of workers]") (internal quotation marks omitted).

does not allege any discriminatory motive; instead, she argues that Thomson's alleged bad faith is the result of a complaint she made about Thomson's communication style.

In *Crowley v. State, Department of Health & Social Services,* we articulated the standard for showing a subjective breach of the implied covenant: The employee "must prove that the employer's termination decision was 'actually ... motivated by an improper or impermissible objective'-that the decision 'was actually made in bad faith.'"[17] In *Crowley,* we concluded that an employer would not be liable for a supervisor's alleged bias where the supervisor "did not fire" the plaintiff even though she "played a tangential role in the events leading up to the firing."[18] The fired employee in *Crowley* testified that, in response to her request not to work under her supervisor anymore, the supervisor became upset and told the employee she "will be sorry."[19] The supervisor sent a letter to a department manager citing her concerns about the employee's behavior.[20] The employee was fired following an independent investigation.[21] We concluded that the supervisor's actions were too attenuated to the termination decision to hold the employer liable for the supervisor's alleged bad faith.[22]

The facts in *Crowley* are analogous to this case. First, Lentine has not shown that Thomson was actually motivated by bad faith. Lentine testified that she wrote to Hilderbrand, her supervisor, complaining about Thomson's communication style. While Hilderbrand testified that he received such an email from Lentine, he did not remember if he transmitted Lentine's concerns directly to Thomson. Instead, he had "discussions" with the parties involved about "the importance [of] communications." Hilderbrand "never had the sense" that Thomson was "out to get" Lentine and, in fact, he noted that early in Hilderbrand's tenure

Thomson had lobbied "pretty hard" to restructure the office so Lentine would supervise Robinson. Although the fact that Ritter approached Thomson, who was not Lentine's supervisor, regarding Lentine's personal emails could raise a question, Thomson's replies to Ritter do not themselves reflect personal animus against Lentine. And it is the superior court's function to weigh conflicting evidence.[23] We cannot conclude that the superior court erred in finding inadequate evidence to show that Thomson acted in bad faith against Lentine.

Second, Lentine has not shown that Thomson played a significant role in the decision to dismiss her. As in *Crowley,* Thomson's email to the Division of Personnel started the investigatory process. But the decision to terminate was based upon several interviews with Lentine and others, at which Thomson was not present. At the meeting in which it was decided that Lentine should be dismissed, Wildlife Division Director Larsen could not recall whether Thomson spoke and was "not even positive that [he] was there." Keane testified that Thomson "didn't have a say on what the decision was as far as dismissal." And Hilderbrand testified that while Thomson was present when he told Lentine she would be dismissed, Thomson did not say anything and was only there as an administrative representative because Keane was unavailable.

After Lentine was terminated and had filed her second grievance, Thomson wrote to Keane in support of the dismissal decision. Thomson stated that Fish and Game did not have an informal "comp time" policy. The denial that Keane drafted, however, did not conclude that Fish and Game did not have a comp time policy, but instead was based on the fact that Lentine did not speak to her supervisor about using such a policy for her Minnesota trip. In addition, Lentine's second grievance was denied by an independent

---

17. 253 P.3d 1226, 1230 (Alaska 2011) (quoting *Era Aviation, Inc. v. Seekins,* 973 P.2d 1137, 1141 (Alaska 1999)).

18. *Id.* at 1232.

19. *Id.* at 1231.

20. *Id.* at 1228.

21. *Id.* at 1228–29.

22. *Id.* at 1232.

23. *In re Adoption of A.F.M.,* 15 P.3d 258, 262 (Alaska 2001) (quoting *Knutson v. Knutson,* 973 P.2d 596, 599–600 (Alaska 1999)).

labor analyst who presumably was not in contact with Thomson. Lentine's union representative also recognized that even if an unofficial comp time policy existed, Lentine "never approached Grant Hilderbrand with a request for comp time." The trial court did not err in finding inadequate evidence to support Lentine's claims that Thomson acted in bad faith toward Lentine and was a significant factor in causing her dismissal.

## 2. The superior court did not err in finding that Lentine did not prove an objective breach of the implied covenant.

### a. Lentine did not prove that the State's investigation was conducted unfairly.

An investigation's fairness or reasonableness "is a fact-dependent question and may depend on the strength of the evidence of the underlying infraction."[24] Lentine argues that the State's investigation was unfair for two related reasons. First, Lentine contends that she did not present evidence of her work in Minnesota because she never believed the investigation was about whether or how much she worked in Minnesota. Instead, she thought the reason for the investigation was that she submitted a timesheet showing work time instead of leave time while she was not physically at the office. Further, she claims that Keane did not understand that Lentine could have completed work outside of the office. But the trial court found that the charges against Lentine focused on "whether or not [Lentine] accurately reported the time worked while she was in Minnesota," and that if Lentine believed she had worked a full week in Minnesota, "she would have presented that evidence."

The trial court did not err in finding that the focus of the investigation was "never realistically a point of confusion." Hilderbrand's memo to Lentine at the start of the investigation described the charge as "misrepresent[ing] actual hours worked on your timesheet" and advised her that the investigative interview would be Lentine's "only opportunity . . . to rebut these allegations, provide explanation or offer mitigating circumstances." Nonetheless, Lentine told Keane that she did not complete substantial work in Minnesota. After Robinson told Keane she believed Lentine did work a full week in Minnesota, Keane arranged a second interview with Lentine to explore this discrepancy. Lentine repeated that although she had checked and responded to work email while in Minnesota, she did not "really consider that working."

In both interviews, Lentine repeatedly expressed remorse for submitting the amended timesheet. She was asked directly about her activity in Minnesota, and as the trial court found, "she would have produced evidence" of her work in Minnesota "if she had actually done [that work]." Lentine points to Keane's testimony that activities such as checking email would count as work if performed in the office, but that alone does not support Lentine's claim that she worked a full week in Minnesota, and the trial court did not err in finding that Lentine worked "at best" one to two hours per day.

Second, Lentine argues that Keane failed to reveal certain facts to the other decision-makers, causing them to miss the "full story" of Lentine's actions. Lentine has not shown how knowledge of these facts would have affected the outcome of the investigation.[25] We agree with the trial court that any potential defects in the investigative process were cured by "the fact that [Lentine] . . . did not, in fact, work the 37 1/2 hours while in Minnesota." The trial court did not err in finding insufficient evidence that the investigation was conducted unfairly.

**24.** *Mitchell v. Teck Cominco Alaska, Inc.*, 193 P.3d 751, 761 n. 32 (Alaska 2008).

**25.** Lentine alleges that Larsen was not told that Lentine initially submitted a leave slip and that Robinson had prepared the amended timesheet, which Hilderbrand approved. But Hilderbrand testified that he signed the amended timesheet unthinkingly and never had a discussion with Robinson about the matter that would have indicated his approval. Lentine also claims the decision-makers did not realize that Robinson vouched for Lentine working a full week in Minnesota. But the investigators were entitled to rely upon Lentine's own repeated statements that she did not believe she had worked in Minnesota, let alone a full 37.5 hours.

### b. Lentine did not prove disparate treatment.

 Lentine argues that her termination was objectively unfair because another employee allegedly committed a similar infraction but was not punished in a similar manner. An employer must "treat like employees alike,"[26] and disparate employee treatment can "violate the objective aspect of the implied covenant."[27] Like employees, in the context of the implied covenant, are "those who are members of the same class, as defined by job position and the nature of the alleged misconduct."[28] The trial court found insufficient evidence that Fish and Game supervisors "knowingly permitted" other employees to "work less than 37.5 hours and not take leave for the difference between time actually worked and the 37.5 hours for which they were paid."

 Lentine argues that Fish and Game's more lenient handling of another employee's amended timesheets is evidence of disparate treatment. But she has not shown that the other employee committed the same infraction for which she was dismissed: intentionally "falsifying information on [a] timesheet." According to Lentine's testimony, the employee went to Paris in October 2007 for a trip combining a work-related conference and vacation time. A timesheet was submitted on his behalf that originally showed work time while the employee was in Paris; it was later changed to leave time. But the employee did not sign the timesheet; he was marked as "unavailable" on the signature line. Hilderbrand testified that Anchorage staff often prepared standard timesheets for employees who were out of town as a "place holder," and those employees would modify the timesheets upon returning. Lentine did not present evidence that the employee in question had arranged for the inac-curate timesheet to be submitted or that he intended to claim his vacation leave time in Paris as work time.

Lentine also claims that Hilderbrand approved a week of "flex time" for the employee traveling to Paris, but while Hilderbrand agreed that Fish and Game allowed for flexibility in scheduling, he testified that "what was imperative was that you worked 37 1/2 hours a week." Lentine did not establish that she cleared any "flex time" arrangement with Hilderbrand or another supervisor.

The State also relies on the testimony of an employees' union negotiator, who maintained that in his experience, the State had "no threshhold for . . . timesheet fraud matters" and "discharges [had] been their resolution." Neal, the director of personnel and labor relations, testified that in deciding to dismiss Lentine, she considered "how we've handled other cases" and noted at least one other case where an employee was terminated for reporting false overtime. Robinson was also terminated for her role in preparing Lentine's inaccurate time sheet. Lentine did not produce evidence of another employee who was disciplined differently for the same infraction. The trial court therefore did not err in finding that Lentine failed to prove disparate treatment.

### B. The Superior Court Did Not Abuse Its Discretion In Finding Lentine's Unfair Labor Practice Claim To Be Untimely Raised.

 Lentine argues that the State committed an unfair labor practice by failing to follow certain provisions laid out in the collective bargaining agreement. The CBA provides that in Step 2 of the grievance process the commissioner of the grievant's department will "respond in writing to the employee."[29] In this case, the response was

---

26. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1224 (Alaska 1992) (quoting *Jones v. Central Peninsula Gen. Hosp.*, 779 P.2d 783, 789 n. 6 (Alaska 1989)).

27. *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002) (citing *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1139–40 (Alaska 1999)).

28. *Hoendermis v. Advanced Physical Therapy, Inc.*, 251 P.3d 346, 357 (Alaska 2011) (citing *Mitchell*, 193 P.3d at 761).

29. *Bargaining Agreement Between the State of Alaska and the Alaska Public Employees Association Representing the Supervisory Unit, July 1, 2007–June 30, 2010*, ALASKA PUBLIC EMPLOYEES ASSO-CIATION, 23, http://su.apea-aft.org/docs/2007SU% 20Contract.pdf. We note that as the superior court found, Lentine did not properly raise the

**380**

drafted by investigator Keane but signed by the Commissioner of the Department of Fish and Game. The CBA provides that in Step 3 of the grievance process, the Commissioner of the Department of Administration (then Annette Kreitzer) is to "respond in writing to the employee."[30] In this case, the Step 3 response was drafted by an independent labor relations analyst and signed by Neal, the director of personnel and labor relations within the Department of Administration.

Because Keane, the initial investigator, drafted the Step 2 response and because Kreitzer did not sign the Step 3 response, Lentine argues the State committed an unfair labor practice. But Lentine did not raise this claim in her complaint, which only sought "damages for the [State's] violation of the covenant of good faith and fair dealing." Lentine did not mention it in her trial brief, which again stated "the issue to be decided" as "whether the State terminated Cindy Lentine in violation of the covenant" when "others ... submitted timesheets which did not reflect their exact location and the exact hours they worked." Lentine raised the claim for the first time during cross-examination of Dennis Geary, a witness for the State. The trial court allowed Lentine to cross-examine Geary on the grievance process for reasons of "judicial economy." After the parties submitted written closing arguments,

the trial court ruled that the claim was untimely. Lentine's claim of an unfair labor practice was based upon an alleged breach of contract, governed by AS 23.40.210,[31] and not upon any breach of the implied covenant related to the termination decision itself. The superior court did not abuse its discretion in ruling that Lentine's unfair labor practice claim was not raised in a timely manner and was therefore waived.[32]

**C. The Trial Court's Attorney's Fee Award Was Not An Abuse Of Discretion.**

During the proceedings below, Lentine asked the superior court to abate the State's attorney's fee award under AS 09.60.010(e), which applies to constitutional claims. The court did not do so, instead ordering Lentine to pay 30% of the State's attorney's fees, or $50,586.14, under the provisions of Alaska Civil Rule 82(b).[33] On appeal, Lentine argues that the superior court abused its discretion by declining to abate the award of attorney's fees based on the equitable factors laid out in AS 09.60.010(e) and Civil Rule 82(b)(3).

We will overturn an award of attorney's fees "only upon a showing of abuse of discretion or a showing that the award is manifestly unreasonable."[34] "Questions as

---

unfair labor practice claim in her complaint. The relevant portion of the CBA was also not submitted to this court.

**30.** *Id.*

**31.** AS 23.40.210(a) provides:

The [collective bargaining] agreement shall include a grievance procedure which shall have binding arbitration as its final step. Either party to the agreement has a right of action to enforce the agreement by petition to the labor relations agency.

**32.** In addition, any error in the post-termination process was cured by the superior court's review of Lentine's termination. Even when a grievance process involves a violation of bargained-for procedures, we must still decide whether the violation "affected the correctness of the decision or had such a harmful or unfair effect as to vitiate the hearing." *Racine v. State, Dep't of Transp. & Pub. Facilities*, 663 P.2d 555, 557 (Alaska 1983). In *City of North Pole v. Zabek*, we concluded that where an employee was terminat-

ed for a relatively minor offense, a post-termination "adversarial proceeding" in which she "had the benefit of counsel.... [and] was allowed to frame the issues that would be explored.... provided [the employee] with all the process due to her." 934 P.2d 1292, 1298–99 (Alaska 1997). Although Lentine's termination was based on the serious charge of dishonesty, the five-day trial before the superior court afforded her a full independent review of the decision to terminate, including "the heightened procedural protection that the right to call witnesses brings." *Id.* at 1298 (citing *Nichols v. Eckert*, 504 P.2d 1359, 1365 (Alaska 1973)).

**33.** Alaska R. Civ. P. 82(b)(2) provides: "In cases in which the prevailing party recovers no money judgment, the court shall award the prevailing party in a case which goes to trial 30 percent of the prevailing party's reasonable actual attorney's fees which were necessarily incurred."

**34.** *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 283 (Alaska 2004) (quoting *Feichtinger v. Conant*, 893 P.2d 1266, 1268 (Alaska 1995)).

to the reasonableness of fees awarded under Civil Rule 82 are committed to the sound discretion of the trial court." [35]

Alaska Statute 09.60.010(c) sets out special provisions for attorney's fee awards in cases involving "the establishment, protection, or enforcement" of constitutional rights. An unsuccessful claimant is protected from paying the portion of the opposing party's attorney's fees devoted to the constitutional claim, unless the claim was frivolous or the claimant had "sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved." [36] Under AS 09.60.010(e), the superior court may, in its discretion, abate an award "otherwise payable" by a constitutional claimant "if the court finds, based upon sworn affidavits or testimony, that the full imposition of the award would inflict a substantial and undue hardship upon the party ordered to pay the fees and costs." [37]

Although Lentine submitted an affidavit claiming financial hardship under AS 09.60.010(e) and continues to seek an abatement under that provision, she has never briefed the threshold question: whether she raised a constitutional claim sufficient to fall under AS 09.60.010(c). We therefore cannot say that the superior court erred in failing to consider Lentine's claims under that provision. Even if the superior court had considered the issue, Lentine's complaint and the bulk of her witness examination and closing arguments were devoted to her primary claim: that the State breached the implied covenant of good faith and fair dealing. She brought up the claim of a due process violation only in passing in her closing arguments. And Lentine had an economic incentive to bring her primary claim even without the due process claim. Thus, the superior court did not abuse its discretion by declining to abate the award of attorney's fees to the State under AS 09.60.010(e).

Lentine contends that the equities of the case weigh in her favor because she was an "honest, ethical, hard-working employee and had no intention of defrauding the State." The State responds that its fee award was reasonable and there is "no authority for the proposition that a court must reduce a fee award based on a plaintiff's contention that she did nothing wrong." Lentine also argues on appeal that the superior court should have varied its award under Rule 82(b)(3), which allows the court to consider factors including "the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts" and "other equitable factors deemed relevant." [38]

We have previously expressed concern over high fee awards against dismissed employees, but our concern has arisen from the possibility that such an award would "impose[ ] an intolerable burden on a losing litigant which, in effect, denies the litigant's right of access to the courts." [39] Lentine's characterization of her actions as an "innocent mistake" involves a question of fact that was litigated at trial, and the superior court's failure to consider it again in determining attorney's fees was not an abuse of discretion.[40]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the superior court.

**35.** *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1016 (Alaska 1999).

**36.** AS 09.60.010(c)(2).

**37.** AS 09.60.010(e).

**38.** Alaska R. Civ. P. 82(b)(3)(I), (K); *see also Gold Country Estates Pres. Grp., Inc. v. Fairbanks N. Star Borough*, 270 P.3d 787, 800 (Alaska 2012) (noting that "[t]rial courts remain free to reduce awards that would otherwise be so onerous to the losing party as to deter similarly situated litigants ... from accessing the courts") (quoting *State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 406 (Alaska 2007)).

**39.** *Peter v. Progressive Corp.*, 986 P.2d 865, 873 (Alaska 1999) (quoting *Bozarth v. Atl. Richfield Oil Co.*, 833 P.2d 2, 6 (Alaska 1992) (Matthews, J., dissenting)).

**40.** We note that Lentine spent considerable time at trial advancing the argument that the amended timesheet was a fair reflection of her work in Minnesota.